Jonathan A. Dessaules, State Bar No. 019439
Ashley C. Hill, State Bar No. 032483
**DESSAULES LAW GROUP**
5343 North 16th Street, Suite 200
Phoenix, Arizona 85016
602.274.5400 tel.
602.274.5401 fax
jdessaules@dessauleslaw.com
ahill@dessauleslaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Sarah G. Jacobs,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Cinnabar Condominium Association,<br><br>　　　　Defendant. | No.<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff Sarah G. Jacobs alleges the following:

**PARTIES AND JURISDICTION**

1. Plaintiff Sarah G. Jacobs ("Jacobs") is a citizen of the State of Arizona and who resides in Maricopa County.

2. Defendant Cinnabar Condominium Association (the "Association") is an Arizona nonprofit corporation with its principal place of business in Phoenix, Arizona.

3. This action arises, in part, under the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and, therefore, the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Jacobs' state law claims under 28 U.S.C. § 1367.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

# GENERAL ALLEGATIONS

5. Since on or around May 10, 2019, Jacobs has owned and resided at the real property located at 2020 West Union Hills Dr., Unit #111, Phoenix, Arizona 85027 (the "Property"), a unit located in the Cinnabar condominium complex.

6. Defendant is the condominium association that manages the Cinnabar condominium complex in accordance with the Declaration of Horizontal Property Regime and Covenant, Conditions and Restrictions recorded against the Property in the Maricopa County Recorder's Office as Instrument No. 1984-0150108, and as most recently amended and restated in the document likewise recorded as Instrument No. 2000-0343852 (the "CC&Rs").

7. One of the reasons Jacobs purchased the Property was to enjoy the benefits of the pool located in the common areas of the Cinnabar condominium complex.

8. Jacobs shares with all other members of the Association a common interest in all the condominium complex's common areas, including the pool.

9. Section 7.5 of the CC&Rs provides as follows:

> **7.5  ANIMALS**
>
> No animals or birds of any kind shall be raised, bred or kept in any Unit or on any portion of the Property, except that usual and ordinary household pets such as dogs and cats (not to exceed 20" in height) or birds may be kept, provided that they are kept under reasonable control at all times. No more than two (2) pets per Unit will be allowed. The Board may enact reasonable rules respecting the keeping of such animals within the Project and may designate certain areas in which such animals may be taken. The Association, by and through the Board, reserves the right to have such pets removed if the pets' behavior becomes objectionable to the Members of the Association, which right shall not be unreasonably applied.

10. Section 7.0 of the Rules promulgated by the Association pursuant to the CC&Rs provide as follows:

> Pets are not permitted to roam freely throughout the Cinnabar property at any time, but must be on a leash held and controlled by an individual accompanying the pet. Any infraction of this section is subject to a $250.00 fine in accordance with the City of Phoenix AR25-160. Animal control has been authorized to make regular tours of the property and to pick up any unleashed animals. Reclaiming animals will be at the resident's expense. Pets may not be chained to any Common Area, including the area in front of or around the unit's front doors or outside the patios.

11. According to the pool rules posted by the Association, "No animals allowed except for service animals." A photograph of the pool rules, as posted by the Association, are attached as Exhibit A.

### JACOBS' DISABILITY

12. Jacobs is a disabled person who lives with Generalized Anxiety Disorder, Posttraumatic Stress Disorder (PTSD), Dissociative Identity Disorder Fugue, and Narcolepsy.

13. Although able to interact socially and foster friendships under limited circumstances, Jacobs' physical and mental impairments substantially severely limit their ability to socially interact, cope with stress, and manage their anxiety, substantially limiting one or more of Jacobs' major life activities.

14. To help manage the disabilities, Jacobs is treated by a licensed therapist on a weekly basis.

15. Jacobs' therapist affirms that Jacobs is disabled under the definitions set forth in the American with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act of 1973.

### JACOBS' DISABILITY-RELATED NEED FOR OFF-LEASH SERVICE ANIMAL

16. Jacobs utilizes a service dog to help avoid panic attacks, anxiety attacks, and dissociative episodes, and to help endure the ones that cannot be avoided.

17. Jacobs' service animals are trained to run ahead to check blind corners ahead of Jacobs, as appropriate, and then alert Jacobs if someone is around the corner, helping avoid anxiety and panic attacks Jacobs may experience from the unexpected interaction.

18. Jacobs' service dog also helps interrupt panic attacks, anxiety attacks, and dissociative episodes, physically stabilizes Jacobs when they become dizzy, provides a brace to help Jacobs get back up if they fall, and will guide Jacobs to a quieter location where they can recover.

19. To maintain the service animal's skills, Jacobs performs ongoing training with the dog outside for fifteen minutes twice a day, during which time the dog must remain off a physical

leash, but whether on an electric leash or no leash, the service animal is trained to respond to Jacobs' voice commands.

20. Jacobs relies on a service dog to cope with their disability, helping enhance their ability to live independently and to fully use and enjoy the Property.

21. To best help at ameliorating the effects of Jacobs' disabilities, the service dog must be left off leash as necessary to perform certain duties or because Jacobs cannot physically hold a leash due to their disability-related symptoms.

22. Jacobs' service animals are not their pets.

**REQUEST FOR REASONABLE ACCOMMODATION FOR SERVICE ANIMAL #1**

23. In April 2019, Jacobs put an offer on the Property and promptly contacted the Association to request a reasonable accommodation for their six-year-old service animal named Max, who was 26" tall at the shoulder, and who they need to have "off leash" at times.

24. Jacobs further sent the Association documentation from their licensed professional counselor explaining their disability-related need for the accommodations.

25. Jacobs detailed some of the tasks Max performed and explaining how he was trained to assist them with their disabilities, that he was required to be with Jacobs 24-hours a day, and that he would be a necessary component to allow them to fully enjoy the Property and the Association's common areas.

26. Jacobs further clarified that when not harnessed with a physical leash, Max would be secured by an electronic leash and that he was trained to respond to Jacobs' voice commands. Additionally, she affirmed he would not enter the pool and that there was no danger of him relieving himself on the Association's landscaping.

27. In May 2019, the Association notified Jacobs that the board had unanimously granted their accommodation with the respect to the size of the dog, but that the dog must be kept on a physical leash at all times.

28. In June 2019, the Association sent Jacobs a violation notice for walking with the service dog off-leash along with several photographs purportedly taken the same day. The photographs were not of Jacobs and Max, although Jacobs would walk off-leash with Max as needed.

29. In response, Jacobs indicated that the Association's actions violated their rights under the Fair Housing Act and were causing them great distress and destabilizing them.

30. The Association responded in turn that having a dog off leash violates the Association's governing documents and city and county code.

31. Jacobs filed a charge of discrimination with HUD for the Association's failure to accommodate their disabilities by allowing the service animal to be kept off leash as needed.

32. Shortly thereafter, an Association board member followed Jacobs to the dumpster, taking photographs of Jacobs with Max off leash as he performed services consistent with his training. Jacobs asked Ms. Lloyd to stop but she refused. Several days later, Jacobs received another violation notice from the Association stemming from the incident.

33. For more than the next year, Jacobs participated in an interactive process with the Association, engaging in several discussions about possible modifications to Jacobs' requested accommodation, which the Association contended were more reasonable, and Jacobs' explaining why those modifications were unworkable.

34. On or around September 11, 2020, the Association ultimately agreed to allow Jacobs to have Max off leash in its common areas so long as he stayed in Jacobs' line of sight and was under Jacobs' control either by electronic collar or voice command. The Association further agreed not to retaliate against Jacobs. In exchange, Jacobs signed an assumption of liability statement regarding the actions of their service animal.

**REQUEST FOR REASONABLE ACCOMMODATION FOR SERVICE ANIMAL #2**

35. On November 27, 2019, Jacobs contacted the Association to provide it notice Maricopa County had extended Max's service animal license for another two years, and that it

1 had also granted service status to a second service dog, Finn, who was then in training to eventually replace Max.

36. Unlike Max, who was a very serious half Rottweiler-half Labrador, Finn is a sweet and playful Labrador.

37. While training to take Max's place, Finn formed a bond with a young child of one of Jacobs' friends in the condominium complex.

38. On November 8, 2020, Max passed away, causing Jacobs to rely instead on Finn for the support Max otherwise provided.

39. Finn went full service at seventeen (17) months old, whereas Max went full service at fifteen (15) months old.

40. Although Finn was called to duty earlier than planned, within two weeks of Max's passing, Finn was waking Jacobs from nightmares and interrupting dissociative episodes.

41. In December 2020, while in the condominium complex's common areas, Finn saw the young child with whom he shared a bond, and Finn trotted over to greet him such that he was not in Jacobs' control.

42. Jacobs hired a trainer to help correct Finn's recall issue.

43. On February 22, 2021, once Finn was fully trained and all recall and behavior issues had been corrected, Jacobs submitted a request to the Association to grant them a similar accommodation to that which it had approved for Max less than six (6) months earlier.

44. Accompanying their February 22, 2021 request was another letter from their therapist reaffirming their disability-related need for the accommodation.

45. In response, on March 23, 2021, the Association notified Jacobs that it was denying their request "as not reasonable and/or necessary under the circumstances."

46. Jacobs request was reasonable and necessary.

47. Although the Association suggested that it would be willing to discuss "reasonable alternatives going forward," it made no suggestions as to what type of alternatives it would be willing to approve.

48. Moreover, given the hostile environment the Association has created, and that Jacobs had already fully participated in a yearlong interactive process that concluded only months earlier with Jacobs' original service dog being allowed off leash, Jacobs should not have had to do it over again to receive the same reasonable accommodation for that service dog's replacement.

49. Jacobs would have provided the Association with additional information to help it reach a determination as to the reasonableness or necessity of Jacobs' requested accommodation, but instead of requesting additional information, the Association denied the accommodation.

50. The Association's board of directors have continued to create a hostile environment for Jacobs to live in, frequently materializing nearby in the common areas when Jacobs is out with Finn doing training activities or utilizing his services, either walking outside to watch them, taking pictures of them, confronting them, or pointing at them while talking to other residents.

51. In the meantime, the Association has issued violations against Jacobs allowing Finn to be in the common area without a leash.

### SPOTLIGHT ISSUE

52. When Jacobs moved into the Property, they discovered that the Association had installed and operated an exterior light near its pool area (the "Spotlight") that shone directly into Jacobs' Property.

53. On August 26, 2019, to Jacobs' relief, the Association disconnected the Spotlight.

54. In October 2020, the wife of one of the members of the Association's board of directors threatened to have the Spotlight turned back on to shine into Jacobs' home.

55. On December 3, 2020, the Spotlight was reconnected. An image of the Spotlight in use, as seen from Jacobs' Property, is attached as Exhibit B.

56. Shortly thereafter, Jacobs emailed the Association, requesting that the Spotlight be disconnected but their request was ignored.

57. About another week later, Jacobs submitted a formal request to the Association that the Spotlight be redirected or disconnected, as had been the status quo for the past year, as it aggravated their disabilities. With the request, Jacobs provided a note from their licensed therapist affirming their disability-related need to have the light redirected out of their window, but Jacobs never received a response from the Association.

58. The Spotlight continues to shine into Jacobs' Property.

## COUNT ONE
### (Violation of the Federal Fair Housing Act)

59. Jacobs incorporates the foregoing allegations as if fully set forth herein.

60. The Fair Housing Act, as amended, imposes affirmative duties on homeowner associations to make reasonable accommodations in rules, policies, practices or services when necessary to afford disabled individuals an equal opportunity to the use and enjoyment of a dwelling.

61. The failure to perform these affirmative duties under the Fair Housing Act constitutes an act of discrimination.

62. To prevail on a claim under 42 U.S.C. § 3604(f)(3), a claimant must prove all of the following elements: (1) that the claimant or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation.

63. 42 U.S.C. § 3602(h) defines a "handicap" to mean (1) a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment.

64. Jacobs is handicapped within the meaning of 42 U.S.C. § 3602(h).

65. The Association has known about the handicap since 2019 when it granted a disability accommodation to allow Jacobs' oversized service animal in the community.

66. The accommodation of Jacobs' handicap is necessary to allow them the ability to conduct ongoing service training and to allow the dog to look around corners, and otherwise assist Jacobs.

67. The accommodation is reasonable. The Association approved a similar accommodation just six months prior to denying the request to accommodate Finn, who has caused no damage or posed a threat while not on a leash. Finn is fully trained and all issues with his overly friendliness were resolved before Jacobs' February 2021 request for accommodation.

68. Granting an accommodation to the requirement that dogs be on leashes does not impose an undue financial or administrative burden on the Association, nor does it require a fundamental alternation of the nature of the condominium association.

69. A homeowner should not be required to subject themselves to ongoing hostilities from the board members who manage their homeowners' association simply because they require accommodations to use and enjoy the common area property all other residents are able to use and enjoy without accommodation.

70. The accommodation is necessary to address Jacobs' disability.

71. Jacobs has suffered emotional and monetary damage as a direct and proximate result of the Association's actions.

72. Pursuant to 42 U.S.C. § 3613(c)(1), Jacobs is entitled to their actual and punitive damages, a removal of all violations in connection with their service animal as the Court deems appropriate, any permanent injunction or other order.

73. Specifically, the actions of the Association and its agents are beyond the pale in civilized society. The Fair Housing Act was enacted, in part, to prevent individuals with a disability from facing public scrutiny, ridicule, or humiliation by requiring entities such as the

Association to grant them reasonable accommodations. The Association has demonstrated malice, ill will, and a deliberate and conscious disregard for the rights of other individuals in a civilized society.

74. Pursuant to 42 U.S.C. § 3613(c)(2) and Section 10.12 of the CC&Rs, Jacobs is entitled to their reasonable attorneys' fees and costs.

## COUNT TWO
### (Violation of Arizona Fair Housing Act)

75. Jacobs incorporates the foregoing allegations as if set forth fully therein.

76. The above allegations constitute a violation of A.R.S. § 41-1491.19(B).

77. Jacobs is entitled to actual and punitive damages.

78. Specifically, the actions of the Association and its agents are beyond the pale in civilized society. The Fair Housing Act was enacted, in part, to prevent individuals with a disability from facing public scrutiny, ridicule, or humiliation by requiring entities such as the Association to grant them reasonable accommodations. The Association has demonstrated malice, ill will, and a deliberate and conscious disregard for the rights of other individuals in a civilized society.

79. Jacobs is also entitled to their reasonable attorneys' fees and court costs pursuant to A.R.S. § 41-1491.33, A.R.S. § 41-1491.36, and Section 10.12 of the CC&Rs.

80. Jacobs is entitled to injunctive relief enjoining the Association from engaging in the discriminatory practices alleged herein.

## COUNT THREE
### (Retaliation under Federal Fair Housing Act)

81. Jacobs incorporates the foregoing allegations as if set forth fully therein.

82. 42 U.S.C. § 3617 provides that it "shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section [3604]."

83. Jacobs engaged in a protected activity by, inter alia, filing discrimination claims against the Association, settling a discrimination claim with the Association, requesting accommodations, and utilizing a service animal that is necessary to afford them equal opportunity to use and enjoy the Property.

84. Jacobs has and continues to be subjected to a pattern of invidiously motivated harassment sanctioned by the Association, including but not limited to, the Association turning on the spotlight shining into Jacobs' home, as previously threatened, and then ignoring Jacobs' request to reposition the light as an accommodation; the Association's board members frequently materializing nearby in the common areas when Jacobs is out with Finn doing training activities or utilizing his services, either walking outside to watch them, taking pictures of them, confronting them, or pointing at them while talking to other residents, and the Association continues to send Jacobs violation notices, all of which cause them extreme emotional distress, and the last of which causing Jacobs to fear they will lose their home.

85. Upon information and belief, a causal link exists between the protected activity and the adverse action, and any legitimate nondiscriminatory reason the Association attempts to articulates to legitimize the adverse actions will be a pretext for its discriminatory motive.

86. Jacobs has suffered damages as a direct and proximate result of the Association's actions.

87. Pursuant to 42 U.S.C. § 3613(c)(1), Jacobs is entitled to their actual and punitive damages, and as the Court deems appropriate, any permanent injunction or other order.

88. Pursuant to 42 U.S.C. § 3613(c)(2), Jacobs is entitled to their reasonable attorneys' fees and costs.

### COUNT FOUR
### (Retaliation under the Arizona Fair Housing Act)

89. Jacobs incorporates the foregoing allegations as if set forth fully therein.

90. The above allegations constitute a violation of A.R.S. § 41-1491.18, which provides that a "person may not coerce, intimidate, threaten or interfere with any person in the exercise of enjoyment of, or having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [A.R.S. § 41-1491.19]."

91. Jacobs is entitled to actual and punitive damages.

92. Jacobs is also entitled to their reasonable attorneys' fees and court costs pursuant to A.R.S. § 41-1491.33 and A.R.S. § 41-1491.36.

### COUNT FIVE
### (Breach of Contract)

93. Jacobs incorporates the foregoing allegations as if set forth fully therein.

94. Jacobs and the Association entered a contract whereby the Association agreed to "not retaliate against Jacobs…. for having requested reasonable accommodations… or otherwise exercised her rights under the State and Federal Fair Housing Acts."

95. The Association breached the terms of the contract by intimidating, threatening, or interfering with Jacobs in the exercise or enjoyment of their right to use and enjoy the Property.

96. As a result of the Association's breach of the contract, Jacobs has been damaged in an amount to be proven at trial.

97. Jacobs is also entitled to their reasonable attorneys' fees and court costs pursuant to Section 11 of the September 2020 contract.

WHEREFORE, Jacobs requests judgment as follows:

(A) Awarding judgment in Jacobs' favor and against the Association;

(B) The issuance of a writ of injunction against the Association prohibiting it from engaging in further invalid actions and preventing it from further refusing to grant reasonable accommodations related to Jacobs' service dog;

(C) Awarding Jacobs their actual damages and punitive damages in amounts to be proven at trial;

(D) Awarding Jacobs their attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2), A.R.S. § 41-1491.33, A.R.S. § 41-1491.36, Section 10.12 of the CC&Rs, and Section 11 of the September 2020 contract; and

(E) Such further relief as the Court deems appropriate.

DATED this 27th day of October 2021.

DESSAULES LAW GROUP

By:   /s/ Jonathan A. Dessaules
Jonathan A. Dessaules
Ashley C. Hill
*Attorneys for Plaintiff*